# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**August 12, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

GLENDA JENNINGS, et vir    )
KEITH JENNINGS,    )
    )
    Plaintiffs/Appellants,    )
    )
VS.    )    Sumner Circuit
    )    No. 16129-C
    )
KENNETH CASE, M.D.;    )
SANDERS AND CASE MEDICAL    )
CLINIC, P.C.;    )    Appeal No.
W. DAVID STEWART, M.D.; and    )    01A01-9804-CV-00192
ASSOCIATED SURGEONS,    )
    )
    Defendants/Appellees.    )

## OPINION
## CONCURRING IN PART AND DISSENTING IN PART

I concur with the court's conclusion that material factual disputes created by Dr. Rubin's affidavits prevent granting a summary judgment for Dr. Stewart. However, I file this separate opinion because I cannot concur with the court's conclusion that Dr. Rubin's affidavits likewise doom the summary judgment for Dr. Case. Notwithstanding Dr. Rubin's rather expansive and largely unsubstantiated notions about the standard of care of referring physicians, the court has overlooked an ineluctable ingredient to malpractice liability. A negligent act or omission by a physician does not give rise to liability unless it caused the patient to suffer injuries that he or she would not otherwise have suffered.

## I.

Dr. Kenneth Case saw Ms. Jennings on three occasions between April 5 and April 19, 1996 for complaints of left arm pain from her elbow to her hand. He first diagnosed her condition as tendinitis and repetitive use syndrome. When Dr. Case examined Ms. Jennings on April 19, 1996 and discovered that she had developed blue nail beds, he suspected that she might be suffering from thoracic outlet syndrome and referred her to Dr. W. David Stewart, a vascular surgeon. Dr. Case's staff obtained an appointment for Ms. Jennings for April 23, 1996 and passed along to Dr. Stewart

that Dr. Case suspected that Ms. Jennings might have thoracic outlet syndrome. As far as the record shows, Dr. Case never saw Ms. Jennings again and never conferred further with Dr. Stewart about her case.[1] The record likewise contains no evidence that either Ms. Jennings or Dr. Case anticipated that they would have a continuing physician-patient relationship following the referral to Dr. Stewart.

Dr. Stewart examined Ms. Jennings for the first and only time on April 23, 1996. He was fully aware that Dr. Case suspected thoracic outlet syndrome. Based on the medical history that Ms. Jennings provided and his own examination, Dr. Stewart ordered nerve conduction studies to rule out the possibility of carpal tunnel syndrome. He also arranged for a follow-up visit with Ms. Jennings for May 6, 1996. Dr. Stewart received the results of the nerve conduction studies on April 29, 1996. These results were negative for carpal tunnel syndrome. Dr. Stewart never discussed the results of these studies with Dr. Case and never even discussed them with Ms. Jennings because she did not keep her May 6, 1996 appointment.

Instead of keeping her May 6, 1996 appointment with Dr. Stewart, Ms. Jennings made a May 7, 1996 appointment with Dr. Verne Allen, a neurosurgeon who had treated her previously. Dr. Allen ordered an arteriogram and referred Ms. Jennings to Dr. Lawrence Pass, another vascular surgeon. Dr. Pass admitted Ms. Jennings to the hospital on May 9, 1996. She underwent a series of vascular surgeries beginning on May 13, 1996, and her left forearm was amputated on May 17, 1996. In the process, she also experienced adult respiratory distress syndrome ("ARDS") which diminished her lung capacity.

Ms. Jennings's medical malpractice claims are stated in the most general terms. Her complaint alleges only that "the defendants each violated the standard of reasonable professional medical care for physicians in their respective specialty areas in their substandard treatment." Later, in the memorandum in opposition to the motions for summary judgment, her lawyer stated that "[t]he *gravamen* of her complaint is that both defendants violated the standard of care in the treatment of her,

---

[1]Even though the record contains no evidence of any conversations between Dr. Case and Ms. Jennings after April 19, 1996, Dr. Case states in his brief that Ms. Jennings once called him at his home after he had referred her to Dr. Stewart. This information cannot be considered at this stage of the proceedings.

failing timely and correctly to diagnose an upper extremity vascular occlusion." Thus, giving Ms. Jennings every benefit of the doubt, she sued Dr. Case and Dr. Stewart for negligence in diagnosing and treating her condition.

The generality of Ms. Jennings's claims requires some judicial guesswork concerning the specific acts of negligence on which Ms. Jennings bases her malpractice claims against Dr. Case. However, because Ms. Jennings must either support her allegations with expert evidence or risk their dismissal, *see* Tenn. Code Ann. § 29-26-115(b) (1980); *Moon v. St. Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998), her claims must be limited to the factual bases of Dr. Rubin's expert opinions. As I read Dr. Rubin's affidavits, his opinion that Dr. Case was negligent rests on the following three acts or omissions: first, Dr. Case's failure to provide Dr. Stewart with copies of his treatment records; second, Dr. Case's failure to discuss with Dr. Stewart the results of the nerve conduction studies that Dr. Stewart ordered; and third, Dr. Case's failure to initiate vascular testing prior to April 19, 1996.[2]

The court's decision regarding Dr. Case, as I understand it, appears to be limited to Dr. Rubin's opinion that Dr. Case was negligent because he failed to provide Dr. Stewart with his treatment records.[3] Accordingly, I assume that the court has decided that Ms. Jennings cannot get to the jury on the other two factual bases for Dr. Rubin's opinion. If my assumption is correct, I am in complete agreement with the result the court has reached on these claims. However, I would reach the result using a different approach applicable to all three factual predicates for Dr. Rubin's opinion. I would find that no reasonable fact-finder could conclude, based on the undisputed facts, that either Dr. Case's failure to send his treatment records to Dr. Stewart, or his failure to discuss the results of the nerve conduction study with Dr. Stewart, or his failure to initiate vascular testing before April 19, 1996 was a cause-in-fact of Ms. Jennings's later medical complications.

---

[2]Based on the facts that Dr. Rubin relied upon, we can, at this stage of the litigation, rule out the possibility that Ms. Jennings is asserting (1) that Dr. Case is somehow vicariously liable for Dr. Stewart's care, (2) that Dr. Case waited too long to refer Ms. Jennings to a specialist, and (3) that Dr. Case was somehow negligent by deciding to refer Ms. Jennings to Dr. Stewart.

[3]The court makes only a passing reference to the fact that Drs. Case and Stewart did not discuss the results of the post-referral nerve conduction study and no reference to Dr. Rubin's opinion that Dr. Case was negligent for failing to initiate vascular testing prior to April 19, 1996.

## II.

I do not base my conclusions in this case on any disagreement with Dr. Rubin's rather broad assertion that the applicable standard of care requires referring physicians to communicate the details of their clinical notes to the specialist to whom they refer a patient.[4] For the purpose of this appeal, we may assume that Dr. Rubin is correct and that referring physicians have a duty to communicate their treatment and findings to the specialist who will be taking over the patient's treatment. We may further assume that telling Dr. Stewart's staff that Dr. Case suspected thoracic outlet syndrome did not comply with Dr. Rubin's view of the standard of care. My conclusion is based on Ms. Jennings's failure to demonstrate that she will be able to prove at trial that Dr. Case's failure to provide his clinical notes to Dr. Stewart caused her later medical problems.

Cause-in-fact is a necessary ingredient of every negligence case. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 597-98 (Tenn. 1993). It has been written into the medical malpractice statute. A plaintiff seeking damages in a medical malpractice case must prove that "[a]s a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries that would not otherwise have been suffered." Tenn. Code Ann. § 29-26-115 (1980). Thus, proof that a physician breached the standard of care is not enough to take a medical malpractice case to the jury. Along with evidence of a breach of the standard of care, the plaintiff must also produce evidence from which the fact-finder may reasonably conclude that the breach of the standard of care caused injuries that the patient would not otherwise have suffered. *See German v. Nichopoulos*, 577 S.W.2d 197, 201 (Tenn. Ct. App. 1978) (holding that a recovery for negligence requires proof of a negligent act that causes a loss).

Applying these principles to this case, Ms. Jennings can recover damages from Dr. Case only if she proves that Dr. Case's failure to communicate the results of his examination to Dr. Stewart caused the later amputation of her arm and the ARDS she later experienced. There is simply no evidence in this record upon which a

---

[4]Except for Dr. Rubin's assertions, I can find no reported case confirming that this is the standard of care when a physician refers a patient to a specialist.

reasonable fact-finder could reach this conclusion.  If anything, the evidence is insurmountably to the contrary.

Ms. Jennings's lawyer questioned Dr. Stewart in great detail about the effect that the absence of Dr. Case's clinical notes had on his treatment of Ms. Jennings. Dr. Stewart's answers were extremely specific and directly to the point.  He stated that he knew Dr. Case suspected thoracic outlet syndrome and that the absence of Dr. Case's clinical notes made absolutely no difference in his examination or treatment of Ms. Jennings.  At one point Dr. Stewart candidly stated:

> It [Ms. Jennings's history] would have made no difference, because the thoracic outlet syndrome itself can be responsible for color changes, and the fact that the nail beds could have been transiently blue would neither have made the diagnosis nor would have ruled it out and would have made no difference in my examination or would have made no difference in the findings that I had during my examination, nor in the recommendations I made.

Later, he repeated:

> And so had I had that information [Dr. Case's records], it would have been of academic interest, but it would have made no difference in the examining technique that I did nor in the further testing.

Finally, after being asked the same question a third time, Dr. Stewart stated:

> Mr. Shockey, any information that I get that is valid is important to me.  Some information is more important than others.  Some information I will put more weight on that others, and so I'm not saying that this information [Dr. Case's clinical records] would have been important or unimportant.  I'm just saying that I would have done the same thing if I had had that information as I would have – as I did do in the absence of it.

The only conclusion that a reasonable fact-finder could draw from these categorical statements is that the lack of Dr. Case's clinical notes did not affect Dr. Stewart's treatment of Ms. Jennings from and after April 23, 1996.  In light of Dr. Rubin's concession that Ms. Jennings's arm was "salvageable between the dates of April 23, 1996 and May 2 or 3, 1996," there is no evidence in this record that Dr. Case's failure to send his clinical notes to Dr. Stewart played any role in the eventual loss of Ms. Jennings's arm.

The court's reluctance to affirm the summary judgment for Dr. Case appears to be based on its concern about Dr. Stewart's motives or credibility. I do not understand how this can become a dispositive issue because Ms. Jennings did not question Dr. Stewart's credibility either in the trial court or in her brief filed in this court. Persons seeking to defeat a summary judgment motion by questioning the credibility of the moving party's evidence must raise the issue in the trial court when the motion is heard. *See Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 942 (Tenn. Ct. App. 1984). As an appellate court, we should refrain from deciding cases based on issues that were not raised in the trial court. *See Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991).

Even if it were appropriate to scrutinize Dr. Stewart's credibility at this juncture, the record provides no objective basis for setting aside the summary judgment for Dr. Case. Summary judgments should be based on evidence that a fact-finder is not at liberty to disbelieve. *See Burgess v. Harley*, 934 S.W.2d 58, 68 (Tenn. Ct. App. 1996). However, credibility concerns should not undermine a summary judgment unless they rise to a level higher than the normal credibility questions that arise whenever a witness takes the stand. *See Hepp v. Joe B's, Inc.*, No. 01A01-9604-CV-00183, 1997 WL 266839, at *2 (Tenn. Ct. App. May 21, 1997) (No Tenn. R. App. P. 11 application filed). While Dr. Stewart is a party to the litigation, and therefore, interested in the outcome, his testimony is credible because it is a statement against interest.

In a comparative fault context, Dr. Stewart's testimony would induce a reasonable fact-finder to assign no fault or less fault to Dr. Case and, of necessity, more fault to Dr. Stewart. One of the basic rules of evidence is that statements against interest carry an indicia of credibility because reasonable persons similarly situated to the declarant would not have made the statement unless they believed it to be true. *See* Neil P. Cohen, et al., *Tennessee Law of Evidence* § 804(b)(3).3, at 602 (3d ed. 1995). Thus, rather than impugning the credibility of Dr. Stewart's testimony concerning Dr. Case's clinical notes, I would find that the testimony is inherently credible and that the testimony would induce a reasonable fact-finder to conclude that Dr. Case's failure to provide Dr. Stewart with his clinical notes, even if negligent, was not a cause of Ms. Jennings's later injuries.

**III.**

Accordingly, I respectfully disagree with the court's conclusion that Ms. Jennings's claim against Dr. Case based on his failure to provide his clinical notes to Dr. Stewart should have survived the motion for summary judgment. To the contrary, I would find that the undisputed evidence requires any reasonable fact-finder to conclude that Dr. Case's actions did not cause Ms. Jennings's later medical complications.

_____
WILLIAM C. KOCH, JR., JUDGE